**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROGER CHURCH,** | : | |
| **Plaintiff,** | : | **Case No. 2:03-cv-20** |
| **v.** | : | **Judge Holschuh** |
| **EXECUTIVE JET SERVICES, INC.,**<br>**et al.,** | : | **Magistrate Judge King** |
| | : | |
| **Defendants.** | : | |
| | : | |

**MEMORANDUM AND ORDER**

Plaintiff Roger Church brings this diversity action against NetJets Services, Inc. ("NJS")

and NetJets Aviation, Inc. ("NJA"),[1] alleging discrimination in violation of the Employees

Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").  Plaintiff has

also asserted state law claims of breach of contract, promissory estoppel, and intentional

infliction of emotional distress.[2]  This matter is currently before the Court on Defendant NJS'

motion for summary judgment (Doc. # 70) and on Defendant NJA's motion for summary

judgment (Doc. # 72).

---

[1]Defendant NetJets Services, Inc. was formerly known as Executive Jet Services, Inc. and
Defendant NetJets Aviation, Inc. was formerly known as Executive Jet Aviation, Inc.

[2]Plaintiff also asserted a claim alleging age and disability discrimination in violation of
the Texas Commission on Human Rights Act.  However, that claim has been dismissed by this
Court.  (Memorandum and Order (June 4, 2003)).

**I. Background**

Plaintiff is a commercial pilot with more than 20 years flying experience.  (Deposition of Roger L. Church at pp. 16-18).  National Air Services ("NAS") is a Saudi Arabian company, located in Jeddah, Saudi Arabia, which operates a fractional ownership and aircraft charter business under the name NetJets Middle East.  (Affidavit of Howard Geddes at ¶ 2, attached as Exhibit A to NJA's Motion to Dismiss for Improper Venue).  Defendant NJA is a Delaware corporation located in Columbus, Ohio.  (Geddes Aff. at ¶ 3).  NJA, *inter alia*, provides resources, including human resources, to NAS.  (Id. at ¶ 4; Deposition of Vincent F. Santulli at pp.10-12).  Defendant NJS is a similar corporation that is affiliated with Defendant NJA.  (Memorandum and Order at p. 2 (December 26, 2002)).

In May 2000, Plaintiff was hired by NAS as a pilot for the Falcon 2000 aircraft.  (Church Dep. at pp. 24-25, 28-29).  Plaintiff was employed by NAS as a pilot for the Falcon 2000 aircraft through the end of October 2000.  (Id. at pp. 28-29; Exhibit 3, attached to Church Dep.).  While employed by NAS, Plaintiff resided in Jeddah, Saudi Arabia.  (Geddes Aff. at ¶ 4).  During this time, Plaintiff also worked with, and became friends with, Jean Pierre LeMaitre.  (Church Dep. at pp. 44-45, 156).

In the fall of 2000, an opening for the position of Chief Pilot with NJA became available.  (Geddes Aff. at ¶ 6; Church Dep. at pp. 46-48).  On November 21, 2000, Plaintiff submitted an application for the Chief Pilot position.  (Church Dep. at pp. 15-16).  The application contained an acknowledgment section that provided, in relevant part:

> I understand that my employment may be terminated, with or
> without cause, and with or without notice, at any time, at the
> option of either the Company or myself, I acknowledge that I do
> not have a contract of employment with the Company and that, in

the future, I will not have any contractual rights of employment
unless such rights are made part of a written agreement executed
by me and by a Vice President or higher level officer of the
Company.

(Exhibit 2, attached to Church Dep.).

Thereafter, Plaintiff interviewed with, among others, Howard Geddes, Vice President of

International Flight Operations with respect to the position of Chief Pilot.  (Church Dep. at pp.

46-47; Deposition of Howard H. Geddes, Jr. at pp. 11-12).  Frank Sliger, the Director of

Operations, also recommended Plaintiff for the position along with Carey Matthews, the Director

of Safety and Standards.  (Deposition of Franklin Sliger at pp. 20-21).  Plaintiff was ultimately

selected as the Chief Pilot.  (Church Dep. at p. 47).  Plaintiff concedes that, at that time he

accepted the position as Chief Pilot, he did not have any other job offers.  (Church Dep. at pp.

47-48).

While employed as Chief Pilot, Plaintiff continued to live in Saudi Arabia and reported

directly to Sliger.  Several months after Plaintiff was hired as Chief Pilot, Sligar indicated that he

wished to leave his position as Director of Operations and return to the United States.  (Sligar

Dep. at pp. 34-35; Church Dep. at pp. 94-95).  Both Plaintiff and Matthews applied for the

position of Director of Operations.  (Church Dep. at pp. 94-95, 99-100).  Plaintiff interviewed for

the position with, among others, Vincent Santulli, Executive Vice President, and Geddes.

(Santulli Dep. at pp. 7-8; Geddes Dep. at p. 22).  Although Geddes believed that Matthews was a

"stronger candidate," he decided to recommend Plaintiff for the position.  (Geddes Dep. at pp.

22-24).

In April 2001, Plaintiff was offered the position of Director of Operations.  (Church Dep.

at pp. 61-62).  Plaintiff concedes that, when he was offered the position of Director of

3

Operations, he did not have any other job offers.  (Id. at p. 63).  Plaintiff accepted the offer.

Thereafter, Plaintiff traveled to Columbus, Ohio for two weeks of training.  (Id. at pp. 54, 62; Geddes Aff. at ¶ 8).  Although Plaintiff did not officially hold the position of Director of Operations until July 1, 2001, he concedes that Geddes considered him to be the Director of Operations as early as May 7, 2001.  (Church Dep. at p. 199).  After interviewing two individuals for the position of Chief Pilot, Geddes sent the following email, dated May 7, 2001, to Plaintiff:

> I had a great interview with both of these individuals and found pros and cons in both.  I leave the decision up to you as this individual will be working with you and for you over the course of your tenure with the company (NJME)....  You are the D[irector of] O[perations] and I feel that is your decision to make.

(Exhibit 37, attached to Church Dep.).  Shortly thereafter, Plaintiff selected Brian Martin as the Chief Pilot.  (Church Dep. at pp. 55, 198).

Following the training Plaintiff received in Columbus, Plaintiff traveled back to his home in Texas for a short vacation.  (Id. at p. 72).  While in Texas on vacation Plaintiff suffered, in his words, a "very, very minor" stroke.  (Id. at p. 73).  Approximately one week after this stroke, Plaintiff sent an email to colleagues and friends indicating that he was doing fine and would be back to work soon.  (Id. at pp. 75-77; Exhibit 10, attached to Church Dep.).  Plaintiff also sent similar emails to Geddes and Santulli.  (Exhibits 11, 15, attached to Church Dep.).

Plaintiff's doctor released Plaintiff to return to work on June 5, 2001.  (Exhibit 14, attached to Church Dep.).  Santulli, however, requested that Plaintiff be examined by a doctor chosen by NJA prior to returning to work.  (Santulli Dep. at p. 25).  Eventually, in late June 2001, Plaintiff returned to work in Saudi Arabia.  (Church Dep. at p. 153).  On July 1, 2001,

Plaintiff officially became the Director of Operations and reported directly to Geddes.  (Church Dep. at pp. 153; Geddes Aff. at ¶ 8).

In the middle part of July 2001, Matthews asked Geddes to meet with Martin and the Chief Flight Attendant Carla Tirel in Paris, France.  (Geddes Dep. at pp. 25-26).  During this meeting, Martin and Tirel told Geddes that they believed that Plaintiff was engaged in an extramarital affair with Maya LeMaitre, the wife of Jean Pierre LeMaitre.  (Id. at pp. 27-28).  On July 26, Geddes met with Plaintiff to discuss the situation.  (Church Dep. at pp. 155-56).  Thereafter, Plaintiff was placed on administrative leave and sent back to the United States.  (Geddes Dep. at pp. 47-48, 50; Church Dep. at p. 157).

Geddes then reported the situation to Santulli, who instructed Geddes to "find out what's happening."  (Santulli Dep. at p. 19).  Geddes went to Saudi Arabia to investigate the allegations of the extramarital affair.  (Geddes Dep. at pp. 28-29).  However, while Geddes was in Saudi Arabia investigating the alleged extramarital affair, Geddes discovered other performance / safety issues related to Plaintiff.  (Geddes Dep. at pp. 29-30).  For example, it was discovered that Plaintiff became aware of various safety concerns involving LeMaitre that arose during his transition to Director of Operations, but failed to properly investigate those concerns.  (Geddes Dep. at pp. 15-17, 30-31; Exhibit 4, attached to Geddes Dep.).

On August 2, 2001, Plaintiff met with William McNeer, Vice President of Safety, in Columbus, Ohio to discuss the safety issues uncovered by Geddes.  (Deposition of William P. McNeer, Jr. at pp. 7-8).  Following his meeting with Plaintiff, McNeer discussed the results of the meeting with Geddes and suggested that Plaintiff be removed from his position due to safety issues.  (Id. at pp. 19-20; Exhibit 1, attached to McNeer Dep.).

Geddes then decided to recommend that Plaintiff be terminated from NJA.  (Geddes Dep. at pp. 41-44).  Santulli agreed with Geddes' recommendation.  (Santulli Dep. at p. 13).  Thereafter, on August 9, 2001, Plaintiff met with Geddes, Robert Strine, Manager of Security Services, and Greg Hill, Human Resources Director.  (Church Dep. at pp. 167-68; Deposition of Robert Strine at pp. 18-19).  During this meeting, Church was informed that he was being "released for unsatisfactory performance."  (Church Dep. at pp. 168-69).

## II.  Discussion

### A.  Standard

Both NJS and NJA have moved for summary judgment in this case.  Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine

6

if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir.

1978).  The court's duty is to determine only whether sufficient evidence has been presented to

make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the

credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing

that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter

of law.  Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as

well as inferences to be drawn from the underlying facts, must be considered in the light most

favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).

Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to

material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress

& Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  A

"material" fact is one that "would have [the] effect of establishing or refuting one of [the]

essential elements of a cause of action or defense asserted by the parties, and would necessarily

affect [the] application of [an] appropriate principle of law to the rights and obligations of the

parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477

U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable

7

jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  <u>See also</u>

<u>Leary</u>, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided,

summary judgment is appropriate if the opposing party fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322.  The nonmoving party must

demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  <u>Hall v.</u>

<u>Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position

is insufficient; there must be evidence on which the jury could reasonably find for the opposing

party.  <u>Anderson</u>, 477 U.S. at 252.  The nonmoving party must present "significant probative

evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material

facts."  <u>Moore v. Phillip Morris Companies, Inc.</u>, 8 F.3d 335, 340 (6th Cir. 1993).  The court may,

however, enter summary judgment if it concludes that a fair-minded jury could not return a

verdict in favor of the nonmoving party based on the presented evidence.  <u>Anderson</u>, 477 U.S. at

251-52; <u>Lansing Dairy, Inc.</u>, 39 F.3d at 1347.

**B.  NJS' Motion for Summary Judgment**

8

Plaintiff alleges that NJS violated § 510 of ERISA, 29 U.S.C. § 1140, by terminating him in order to prevent his access to certain benefits.  Additionally, Plaintiff has asserted state law claims of breach of contract, promissory estoppel and intentional infliction of emotional distress. NJS argues that, because it was never Plaintiff's employer, Plaintiff's claims are without merit.

### 1.  ERISA Claim

ERISA makes it unlawful for an employer to terminate an employee for the purpose of interfering with the employee's rights under an employee benefit plan or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.[3]  29 U.S.C. § 1140.  ERISA defines "employee" as "any individual employed by an employer."  29 U.S.C. § 1002(6).

Plaintiff has failed to produce any evidence to indicate that he was ever employed by NJS.  In fact, the evidence in the record suggests the opposite. For instance, Plaintiff's W-2 forms for the years 2000 and 2001 both indicate that NJA was Plaintiff's employer.  (Exhibits 5, 6, attached to Church Dep.).  Plaintiff's final paycheck was also issued by NJA.  (Exhibit 7, attached to Church Dep.).  Additionally, Plaintiff's application for unemployment compensation listed NJA as his employer.  (Exhibit M, attached to Defendant NJS' September 16, 2002 Motion to Dismiss).  In fact, there is no mention of NJS in any of Plaintiff's employment documents.

Plaintiff has failed to provide any evidence to suggest that NJS was, at any time, his employer.  In fact, in his deposition, Plaintiff testified that he did not consider NJS to be his

---

[3]This Court notes that Plaintiff has failed to establish the existence of an ERISA qualified plan.  However, because NJS has not raised this issue, the Court will assume the existence of an ERISA qualified plan for the purpose of this motion for summary judgment.

employer.[4]  Under these circumstances, Plaintiff simply cannot maintain an ERISA claim against NJS.

### 2.  State Law Claims

For the same reason, Plaintiff's state law claims against NJS are also without merit.[5]  In order to state a claim for breach of contract, Plaintiff must establish a valid and enforceable contract.  See Samadder v. DMF of Ohio, Inc., 154 Ohio App.3d 770, 778 (Franklin Cty. Ct. App. 2003).  Plaintiff has failed to produce any evidence of an employment contract between himself and NJS.

Additionally, in order to state a claim for promissory estoppel, Plaintiff must show: (1) that NJS made a promise, (2) which it reasonably should have expected to induce action or forebearance by Plaintiff, (3) that there was such action or forebearance, and (4) injustice can only be avoided by enforcement of the promise.  See Mers v. Dispatch Printing Co., 19 Ohio St.3d 100, 104 (1985).  However, Plaintiff has failed to produce evidence of any promises made by NJS regarding employment or that he relied to his detriment on any such promises.

Finally, to state a claim for intentional infliction of emotional distress, Plaintiff must establish that NJS acted in an extreme and outrageous manner and that Plaintiff suffered severe emotional distress.  Yeager v. Local Union 20, 6 Ohio St.3d 369, 374 (1983) (citations omitted);

---

[4]Although counsel for NJS objected to this question, arguing that it called for a legal conclusion, the Court believes that the question properly sought Plaintiff's belief regarding his alleged employment with NJS.

[5]NJS argues that, because Plaintiff's ERISA claim is without merit, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  However, because this case is based on diversity jurisdiction, 28 U.S.C. §1332, the Court has original jurisdiction over Plaintiff's state law claims.

Paugh v. Hanks, 6 Ohio St.3d 72, 78 (1983)(quotation omitted).  Plaintiff has not produced any

evidence to suggest that NJS acted in an extreme and outrageous manner or that Plaintiff

suffered severe emotional distress as a result of any of NJS' actions.  Therefore, this Court

concludes NJS' motion for summary judgment is meritorious.

### C.  NJA's Motion for Summary Judgment

#### 1.  ERISA Claim

Plaintiff also alleges that NJA violated ERISA by terminating him in order to prevent his

access to certain benefits.  As was discussed *supra*, ERISA makes it unlawful for an employer to

terminate an employee for the purpose of interfering with the employee's rights under an

employee benefit plan or for the purpose of interfering with the attainment of any right to which

such participant may become entitled under the plan.[6]  29 U.S.C. § 1140.  NJA argues that,

because Plaintiff was terminated for nondiscriminatory reasons, his ERISA claim must fail.

In order to establish a violation of § 1140, Plaintiff must show that NJA had a specific

intent to violate ERISA.  See Humphreys v. Bellaire Corp., 966 F.2d 1037, 1043 (6th Cir.

1992)(quoting Rush v. United Technologies, Otis Elevator Div., 930 F.2d 453, 457 (6th Cir.

1991)).  See also Smith v. Ameritech, 129 f.3d 857, 865 (6th Cir. 1997)(citations omitted).

Although Plaintiff need not show that NJA's sole purpose in terminating him was to interfere

with ERISA benefits, Plaintiff must at least establish that it was "a motivating factor" in the

decision.  Humphreys, 966 F.2d at 1043 (citations omitted).

Plaintiff has not presented any direct evidence that NJA had the specific intent to

---

[6]As was noted *supra*, note 3, Plaintiff has failed to establish the existence of an ERISA qualified plan.  However, because NJA has not raised this issue, this Court will assume the existence of an ERISA qualified plan for the purpose of NJA's motion for summary judgment.

11

interfere with Plaintiff's ERISA benefits. Nevertheless, Plaintiff can state a *prima facie* case under § 1140 by "showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Pennington v. Western Atlas, Inc., 202 F.3d 902, 906 (6th Cir. 2000)(quoting Smith, 129 F.3d at 865). See also Schweitzer v. Teamsters Local 100, -- F.3d --, 2005 WL 1431417, * 3 (6th Cir. June 21, 2005). The Sixth Circuit has also noted that, although not part of a *prima facie* case, a plaintiff must also establish a causal connection between the qualified ERISA plan benefits and the adverse employment action. Schweitzer, 2005 WL 1431417, *3; Smith, 129 F.3d at 865.

If Plaintiff proves a *prima facie* case, NJA must "introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged action." Humphreys, 966 F.2d at 1043 (citations omitted). If NJA does in fact produce such evidence, then Plaintiff must establish that NJA's reason is pretextual. Id.

At the *prima facie* stage, Plaintiff's burden is slight; Plaintiff must merely produce some evidence indicating that Defendant intentionally interfered with his rights under an ERISA plan or his future attainment of such rights. Humphreys, 966 F.2d at 1043. In this case, Plaintiff relies heavily on the temporal proximity between his stroke and his termination. Plaintiff was terminated on August 9, 2001, a little more than two months after he suffered a minor stroke.

Assuming, *arguendo*, that the temporal proximity between Plaintiff's stroke and his termination is sufficient to create a *prima facie* case of discrimination in violation of ERISA, this Court concludes that NJA has offered legitimate, nondiscriminatory reasons for Plaintiff's termination. NJA contends that it terminated Plaintiff because of safety concerns that were not

12

addressed by Plaintiff while acting as the Director of Operations and because of Plaintiff's alleged affair with Maya LeMaitre.

With respect to the alleged safety concerns, NJA contends that Plaintiff was aware of certain safety violations/concerns involving Jean Pierre LeMaitre that occurred prior to or during Plaintiff's transition to Director of Operations. McNeer, who was involved with the investigation into Plaintiff's conduct stated that the safety violations/concerns related to LeMaitre "had to be stopped, otherwise somebody could get killed." (McNeer Dep. at p. 11). NJA contends, however, that Plaintiff failed to investigate those concerns once he officially became the Director of Operations.

According to Geddes, Plaintiff's direct supervisor, "Roger and I could [not] work together since he appeared not to be addressing the safety issues." (Geddes Dep. at pp. 43-44). McNeer prepared the following summary relating to the safety violations/concerns:

> (1) Roger Church has a low level of sensitivity to safety standards.
>
> (2) Roger Church's close friendship with Jean Pierre LeMaitre clouded his limited ability to assess the risk that Jean Pierre LeMaitre was to himself and others.
>
> (3) Roger Church exposed NJME to unacceptable colossal risk in allowing Jean Pierre LeMaitre to be a NJME flight crewmember.

(Exhibit 1, attached to McNeer Dep.). McNeer concluded that termination of Plaintiff's employment was warranted. (Id.). Both Geddes and Santulli agreed. (Geddes Dep. at pp. 41-44; Santulli Dep. at p. 13).

With respect to the alleged affair, McNeer's summary concluded that "Roger Church's involvement with Jean Pierre LeMaitre's wife was sufficient enough to cause the perception that

there was an ongoing affair." (Exhibit 1, attached to <u>McNeer Dep.</u>). Plaintiff concedes that there could have been a perception of inappropriate conduct. (<u>Church Dep.</u> at p. 161).

In response to an argument that such an alleged affair was not prohibited by NJA, NJA contends that, even if the alleged affair was not explicitly a violation of any rule or company policy, it made other employees uncomfortable and would make NJA look bad in an area governed by Islamic law, which prohibits such conduct. (<u>Geddes Dep.</u> at pp. 28, 50). This Court therefore concludes that NJA has offered legitimate, nondiscriminatory reasons for Plaintiff's termination.

In order to show that NJA's stated reasons for Plaintiff's termination were pretextual, Plaintiff must show, by a preponderance of the evidence, that either: (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his discharge, or (3) the proffered reasons were insufficient to motivate discharge. <u>Pennington</u>, 202 F.3d at 909 (quoting <u>Manzer v. Diamond Shamrock Chemicals Co.</u>, 29 F.3d 1078, 1084 (6th Cir. 1994)). As the Sixth Circuit has recognized, evidence within the first category and the third category is "easily recognizable." <u>Manzer</u>, 29 F.3d at 1084. The second category, by contrast, involves an "indirect" attempt to undermine the employer's credibility. <u>Id.</u>

To establish pretext based on the first category, Plaintiff must produce evidence to show that the proffered bases for Plaintiff's termination never happened, *i.e.,* that they are factually false. In this case, NJA's proffered reasons for terminating Plaintiff do have a basis in fact.

Plaintiff does not deny the safety violations/concerns pertaining to Jean Pierre LeMaitre. Nor does Plaintiff deny having knowledge of those safety violations/concerns. Instead, Plaintiff argues that the violations/concerns occurred before he officially became the Director of

Operations and, therefore, he should not be held responsible.  Several facts, however, support

NJA's decision to terminate Plaintiff.

First, Plaintiff was, prior to July 1, 2001, exercising at least some authority as Director of

Operations.  As was discussed *supra*, Plaintiff selected his replacement for the position of Chief

Pilot prior to officially becoming the Director of Operations.  After interviewing two candidates

for the position of Chief Pilot, Geddes stated in an email to Plaintiff that, "You are the D[irector

of] O[perations] and I feel that is your decision to make."  (Exhibit 37, attached to <u>Church Dep.</u>).

Thus, it would appear that Plaintiff had authority to look into the alleged safety

violations/concerns prior to officially becoming the Director of Operations.

Second, even if the alleged safety violations/concerns occurred during a period in which

Plaintiff had no authority to act, Plaintiff was aware of the safety concerns once he officially

became Director of Operations and yet failed to conduct any investigation or remedy the

situation.  Therefore, it cannot be reasonably said that the safety concerns identified by NJA had

no basis in fact.

With respect to the alleged affair, although Plaintiff denies any wrongdoing, he admits

there could have been a perception of inappropriate conduct.  (<u>Church Dep.</u> at p. 161).  The

perception of an extramarital affair, in an area where such conduct is prohibited, is likely to have

an impact similar to an actual affair.  Geddes testified that Plaintiff's conduct made other

employee's uncomfortable and that it could potentially put NJA's relationship with NAS at risk.

(<u>Geddes Dep.</u> at pp. 28, 50).  Therefore, this Court concludes that there is a legitimate basis in

fact for NJA's decision to terminate Plaintiff.

To establish pretext based on the third category, Plaintiff must offer evidence to show

that NJA's proffered reasons were insufficient to actually motivate his discharge. This type of evidence usually "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in [conduct] substantially identical ... to that which the employer contends motivated its discharge of the plaintiff." Manzer, 29 F.3d at 1084. Plaintiff, however, has not identified any employees of NJA that were treated differently based on similar conduct. Nor has Plaintiff produced any evidence to suggest that the alleged safety violations/concerns and the alleged affair were insufficient to justify termination.

To establish pretext with respect to the second category, Plaintiff must produce evidence that makes it more likely than not that the proffered reason did not actually motivate his discharge. Manzer, 29 F.3d at 1084. Plaintiff, however, may not merely rely upon the evidence used to establish his *prima facie* case, but must, instead, introduce additional evidence that NJA intended to interfere with ERISA benefits. Id. See also Smith v. Hinkle Mfg., Inc., No. 00-3320, 2002 WL 1215607, *5 (6th Cir. June 4, 2002).

As was discussed *supra*, Plaintiff relies heavily on temporal proximity. However, while proof of proximity may provide enough support for a *prima facie* case, proximity alone will not always be enough to survive summary judgment. See Alderdice v. American Health Holding, Inc., 118 F. Supp.2d 856, 866-67 (S.D. Ohio 2000)(citing Humphreys, 966 F.2d at 1044). In this case, as was discussed *supra*, Plaintiff was terminated by NJA just over two months after suffering a minor stroke. While the proximity between Plaintiff's stroke and his termination may be sufficient to satisfy Plaintiff's *prima facie* case, Plaintiff must introduce some other evidence to overcome NJA's legitimate, nondiscriminatory reasons for his termination.

Plaintiff notes that the alleged safety concerns and the alleged affair were not addressed

16

by NJA until after he returned to work following his stroke. However, as pointed out by NJA, the alleged affair did not occur until after Plaintiff returned to work following his stroke and the safety concerns were not uncovered until Geddes started investigating the alleged affair. (Defendants['] ... Reply at p. 9; see also Geddes Dep. at pp. 28-30).

Plaintiff also argues that pretext can be shown because, in a post-termination fact-finding memo, it was noted that Plaintiff had suffered a stroke. However, that memo is dated August 30, 2001, which is after Plaintiff was terminated. (Exhibit 1, attached to McNeer Dep.). There is no evidence to suggest that the memo was created prior to Plaintiff's termination or that it was relied upon to make that determination. It is simply not reasonable to conclude that the reference to Plaintiff's stroke in the August 30, 2001 post-termination fact-finding memo is sufficient to show pretext regarding NJA's legitimate, nondiscriminatory reasons for terminating Plaintiff.

Finally, this Court notes that Plaintiff has done nothing to draw a causal connection between his stroke and his termination. Although Plaintiff suggests that the safety concerns and alleged affair were not the real reasons for his termination, Plaintiff has done nothing to tie the stroke he suffered in the spring of 2001 to his termination in August of 2001. Instead, Plaintiff contends that the real reason he was terminated was because Matthews knew that, as long as Plaintiff was Director of Operations, his "days were numbered," and therefore waged a campaign to have Plaintiff terminated. (Church Dep. at p. 104-109). Plaintiff speculates that Matthews started the rumors of the alleged affair and manipulated other employees to say negative things about Plaintiff. (Id.). While Plaintiff's speculations may be true, they do not establish a connection between Plaintiff's stroke and his termination in August 2001. Therefore, this Court concludes that Defendant NJA's motion for summary judgment on Plaintiff's ERISA claim

should be granted.

### 2. Employment Contract

Plaintiff also claims the existence of an employment contract between himself and NJA that had a duration of 36 months or, alternatively, that NJA promised to employ him for 36 months.  Plaintiff argues that NJA breached that contract and/or promise by terminating him prior to the expiration of a 36 month period.  NJA, however, argues that Plaintiff was an at-will employee and that, therefore, his termination was proper.

The general rule under Ohio law is that, in the absence of a written contract of employment stating a definite term of duration, an employment relationship is terminable at the will of either the employer or the employee.  Irwin v. Marquette Medical Systems, Inc., 107 F. Supp.2d 974, 990 (S.D. Ohio 2000); Srail v. RJF International Corp., 126 Ohio App.3d 689, 709 (Cuyahoga Cty. Ct. App. 1998)(citing Henkel v. Educational Research Council of America, 45 Ohio St.2d 249, 255 (1976)).

In this case, Plaintiff identifies the "International Assignment Agreement" ("IAA") as a written contract setting a 36 month term.  (Church Dep. at p.; Exhibit 9, attached to Church Dep.).  Plaintiff alleges that NJA breached this contract by terminating his employment prior to the expiration of 36 months.  In particular, Plaintiff points to a clause in the IAA that provides that, "it is anticipated that the length of the assignment will be 36 months from your start date, although business conditions may require the Company, with your approval, to reduce or extend this period."  (Exhibit 9, attached to Church Dep.).  NJA, on the other hand, argues that the IAA is not an employment contract and, in any event, does not set a definite term of 36 months.

This Court agrees that the IAA is not an employment contract.  In particular, the IAA

18

provides, in relevant part:

> The items in this agreement do not create a contract of
> employment, but simply seek to confirm the conditions, which
> pertain to your international assignment. During your assignment,
> you will continue to be an at-will employee of Executive Jet under
> the terms and conditions of your original employment with the
> Company. In the event of any change in circumstances, or
> additional matters not known at this time, the Company reserves
> the right to make adjustments to this agreement.

(Exhibit 9, attached to <u>Church Dep.</u>). Additionally, as was discussed *supra*, when Plaintiff was

originally hired by NJA, he signed an acknowledgment that provided, in relevant part:

> I understand that my employment may be terminated, with or
> without cause, and with or without notice, at any time, at the
> option of either the Company or myself, I acknowledge that I do
> not have a contract of employment with the Company and that, in
> the future, I will not have any contractual rights of employment
> unless such rights are made part of a written agreement executed
> by me and by a Vice President or higher level officer of the
> Company.

(Exhibit 2, attached to <u>Church Dep.</u>). Plaintiff has not identified any other written agreements

that would constitute an employment contract.

Moreover, while the IAA does "anticipate" a 36 month term, the agreement makes clear

that such a term is not definite. (Exhibit 9, attached to <u>Church Dep.</u>). Plaintiff concedes that, as

he understood the IAA, NJA reserved the right to change the length of his employment. (<u>Church

Dep.</u> at pp. 69-71). In any event, this Court cannot conclude that a reasonable person would

read the "business conditions" clause in the IAA to include the performance issues of a particular

employee. Thus, the general rule applies in this case; Plaintiff was an at-will employee of NJA.

However, the Ohio Supreme Court has recognized two exceptions to the general rule.

First, the doctrine of promissory estoppel may be raised to prevent an employer from asserting

19

that the employment relationship was terminable at will. <u>Wright v. Honda of America Mfg., Inc.</u>, 73 Ohio St.3d 571, 574 (1995) (citing <u>Mers</u>, 19 Ohio St.3d at 104-05). Second, the facts and circumstances of the case may give rise to an implied contract.[7] <u>Id.</u>

### a. Promissory Estoppel

As was discussed *supra*, in order to state a claim for promissory estoppel, Plaintiff must show: (1) that NJA made a promise, (2) which it reasonably should have expected to induce action or forebearance by Plaintiff, (3) that there was such action or forebearance, and (4) injustice can only be avoided by enforcement of the promise. <u>See Mers</u>, 19 Ohio St.3d at 104.

Plaintiff argues that NJA promised to employ him for a period of 36 months. In support of this contention, Plaintiff again relies on the IAA which, as was noted *supra*, provides that, "it is anticipated that the length of the assignment will be 36 months from your start date, although business conditions may require the Company, with your approval, to reduce or extend this period." (Exhibit 9, attached to <u>Church Dep.</u>). NJA argues that Plaintiff has failed to establish a promise on the part of NJA or that Plaintiff relied to his detriment on any such promise.

As was discussed *supra*, although the IAA does "anticipate" a 36 month term, the agreement makes clear that such a term is not definite. (Exhibit 9, attached to <u>Church Dep.</u>). Moreover, Plaintiff concedes that, as he understood the IAA, NJA reserved the right to change the length of his employment. (<u>Church Dep.</u> at pp. 69-71). Plaintiff has not identified any other promises allegedly made by NJA regarding the length of his employment.

However, even if there was a promise of continued employment for 36 months, Plaintiff

---

[7]Plaintiff has not, however, specifically argued that there was an implied contract or produced any evidence to suggest the existence of an implied contract.

has failed to establish that he relied to his detriment on that promise. Plaintiff concedes that he

did not have any other job offers when he accepted the position of Director of Operations.

(Church Dep. at p. 63). Nor has Plaintiff offered any other evidence to explain how he

detrimentally changed his position in reliance on any promises made by NJA.[8] See Srail, 126

Ohio App.3d at 709; Penwell v. Amherst Hosp., 84 Ohio App.3d 16, 19 (Lorain Cty. Ct. App.

1992). As noted by the Sixth Circuit, "merely continuing to work cannot constitute additional

consideration sufficient to modify an at-will employment relationship." Humphreys, 966 F.2d at

1041 (citing Henkel, 45 Ohio St.2d 249; Mers, 19 Ohio St.3d 100). Therefore, it cannot be

reasonably found that promissory estoppel applies in this case.

### 3. Intentional Infliction of Emotional Distress

As was noted *supra*, in order to state a claim for intentional infliction of emotional

distress, Plaintiff must establish that extreme and outrageous conduct on the part of NJA caused

severe emotional distress. Yeager, 6 Ohio St.3d at 374; Paugh, 6 Ohio St.3d at 78. Liability for

intentional infliction of emotional distress is found only where the conduct is so "outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community.'" Yeager, 6 Ohio St.3d at

374-75 (quoting Restatement (Second) of Torts, § 46(1), cmt. d at 73 (1965)); [see also

Godfredson, 173 F.3d at 376].

Initially, this Court notes that Plaintiff has not responded to NJA's motion for summary

---

[8]Plaintiff testified that, when he became the Director of Operations, he was entitled to the
same benefits, lived in the same villa and drove the same car as when he was Chief Pilot.
(Church Dep. at p. 63). Moreover, Plaintiff's wife testified that they did not incur any additional
expenses with respect to their home in Texas. (Deposition of Willow Dean Church at pp. 9-12).

judgment with respect to the claim of intentional infliction of emotional distress. In any event, the Sixth Circuit has noted that an employer's adverse employment action, even if based on discrimination, is not extreme and outrageous conduct without proof of something more. Godfredson, 173 F.3d at 376. Plaintiff has failed to identify any action on the part of NJA that would constitute extreme and/or outrageous conduct.

Moreover, even if this Court were to conclude that NJA had acted in an extreme and outrageous manner, Plaintiff has failed to establish that he suffered severe emotional distress. Ohio courts have noted that severe emotional distress does not exist where: (1) the plaintiff has not sought medical or psychiatric treatment, or (2) the plaintiff is able to work or otherwise function in his daily life. See Miller v. City of Columbus, 920 F. Supp. 807, 824 (S.D. Ohio 1996) (citations omitted). In this case, Plaintiff has failed to submit any evidence that he sought treatment as a result of his termination, nor has he indicated that he was unable to work or otherwise function as a result of NJA's actions. Therefore, this Court concludes that NJA's motion for summary judgment, in this regard, has merit.

**WHEREUPON**, Defendant NJS' motion for summary judgment (Doc. # 70) is **GRANTED**. Defendant NJA's motion for summary judgment (Doc. # 72) is also **GRANTED**. The Clerk shall enter **FINAL JUDGMENT** in this action in favor of the Defendants.

<strong>IT IS SO ORDERED.</strong>

August 11, 2005                                    /s/ John D. Holschuh
                                                   John D. Holschuh, Judge
                                                   United States District Court

22